AO 91 (Rev. 11/11) Criminal Complaint

AUSA Nathalina Hudson (312) 353-1123

FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JUN 1 7 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

YEVGENY ODESSKY

CASE NUMBER:
**UNDER SEAL**

**16 C R      397**

MAGISTRATE JUDGE SCHENKIER

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about February 13, 2016, at Buffalo Grove, in the Northern District of Illinois, Eastern Division, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 42, United States Code, Section 1320a-7b(b)(1)(A) | ODESSKY knowingly and willfully solicited and received, directly and indirectly, overtly and covertly, remuneration in the amount of $3,000 from ODESSKY in return for ODESSKY referring patients to CS's home health agency for the furnishing and arranging for the furnishing of services for which payments may be made in whole and in part under a Federal health care program, namely Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A). |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Peter Theiler*

PETER THEILER
Special Agent, United States Department of Health and Human Services

Sworn to before me and signed in my presence.

Date: June 17, 2016

City and state: Chicago, Illinois

*Judge's signature*

SIDNEY I. SCHENKIER, U.S. Magistrate Judge

UNITED STATES DISTRICT COURT    )
                                 )
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Peter S. Theiler, being duly sworn, state as follows:

1.    I am a Special Agent with the U.S. Department of Health and Human Services. I have been so employed since approximately June 2002.

2.    As part of my duties as U.S. Department of Health and Human Services Special Agent, I investigate violations relating to federal criminal laws, including various health care fraud prohibitions. I am familiar with the applicable laws and regulations governing the Medicare and Medicaid health insurance program, and with various types of schemes to defraud the Medicare and Medicaid programs.

3.    This affidavit is submitted in support of a criminal complaint alleging that YEVGENY ODESSKY violated Title 42, United States Code, Section 1320a-7b(b)(1)(A).

4.    Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ODESSKY with accepting kickbacks in exchange for the referral of Medicare patients, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

5.    This affidavit contains summaries of certain audio/video recorded and translated conversations from the Russian language into English. Certain portions of the conversations are in Italics to denote the use of English words during the conversations. At times, I have provided my understanding and interpretation of portions of the summaries in brackets. My understanding and interpretation of recorded conversations set forth in this affidavit are based on my knowledge of the investigation to date and review of translations of consensually recorded conversations, the context of the conversations, prior and subsequent conversations, information provided by a confidential informant, the results of physical surveillance, conversations with other officers and agents, and my experience and familiarity with these types of investigations. The summaries of conversations set out in this affidavit do not include all potentially criminal conversations recorded during this investigation, or all statements or topics covered during the course of the recorded conversations. The quoted material contained in the Affidavit is based on draft translations of the recorded conversations, not final translations.

6.    The statements in this affidavit are based on my personal knowledge and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.

2

## BACKGROUND OF MEDICARE[1]

7.     The United States Department of Health and Human Services (HHS) is an agency of the United States government. HHS's activities, operations, programs, and obligations are funded with federal monies. These programs include the Health Insurance for the Aged and Disabled Program, commonly known as Medicare.

8.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

9.     Medicare Part A helps pay for medically necessary home health and hospital care. Medicare authorizes payment for home health care only if the care was actually provided and was medically necessary, that is, the services were required because of disease, disability, infirmity, or impairment. Medicare will not pay for services and treatment that were not actually provided or for which the patient did not meet the criteria necessary to justify the claimed service or treatment.

10.     Under Home Health Care Medicare Part A, a patient is eligible for coverage if a patient is "confined to the home." A patient is confined to the home

---

[1] The information in this section is based on my experience and training related to investigating health care fraud.

when an illness or injury restricts his/her ability to leave his/her place of residence except with the aid of supporting devices or if s/he has a condition which is such that leaving his home is medically contraindicated.

11.    The program requires that a claimant-home health care provider (also known as a "home health agency") actually render the services for which the provider submits a claim.  To be paid for services rendered, a provider must submit a claim for payment containing certain required information pertaining to the patient, including the type of services provided, the procedure code, the date and price of such services, and a certification that such services were personally rendered by the provider, and the referring physician.

12.    Medicare typically approves home health care for a 60-day period of time. The 60-day periods are referred to as, "episodes." The first day of the initial cycle of home health care is known as a Start of Care ("SOC"). After the SOC, a patient must be "recertified" by a physician to receive additional 60-day episodes of home health care. These new cycles are known as "recertifications."

## THE FEDERAL ANTI-KICKBACK STATUTE

13.    Title 42, United States Code, Section 1320a-7b(b)(1)(A) prohibits health care providers from soliciting or receiving remuneration or payments in exchange for the referral of Medicare patients or other federally insured beneficiaries. Specifically, the statute provides in pertinent part:

4

Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program. . . shall be guilty of a felony.

14.    Under the federal anti-kickback statute, among other things, it is illegal to knowingly and willfully solicit or receive money or remuneration of any sort in exchange for the referral of a patient for home health care services for which payment may be made under Medicare.[2]

## THE INVESTIGATION

15.    Based on a review of Medicare's Provider Enrollment, Chain, and Ownership System (PECOS), ODESSKY is a physician whose mailing address is on Oakton Street in Skokie, Illinois. However, recording activity during kickback transactions occurred at an address on South Buffalo Grove Road in Buffalo Grove, Illinois, which is, based on my own observations and my review of the recordings, a medical office where ODESSKY sometimes works. According to the website for the state of Illinois's Department of Financial and Professional Regulation (IDFPR), ODESSKY has been licensed as a physician in the state of Illinois on a temporary and/or permanent basis since approximately 1991. According to Medicare claims information, ODESSKY has been the certifying physician for Medicare beneficiaries

---

[2]    Similarly, claims for items or services resulting from a violation of the anti-kickback statute are false claims for purposes of subchapter III of chapter 27 of Title 31. *See* 42 U.S.C. § 1320a-7b(g).

for whom home health agencies have billed just over $1.3 million from January 1, 2010 through March 3, 2016.

16.     The Confidential Source is the owner of a home health agency located in the north suburbs of Chicago. Law enforcement obtained information regarding the CS's criminal history.  In the 1990s, CS was twice arrested for retail theft, and he was given court supervision for one of the two incidents.

17.     The CS agreed to cooperate after s/he was recorded by law enforcement agents making kickback payments to a cooperating physician in exchange for the physician's referral of home health patients to the CS's home health agency. When initially approached by agents in March 2014, CS initially denied paying kickbacks in exchange for the referral of Medicare patients to the CS's home health agency. When agents confronted the CS with their knowledge of his/her payment of kickbacks, CS admitted to paying money in exchange for patient referrals and admitted knowing that such activity was illegal.

18.     At the time of CS's interview, agents had a search warrant for CS's home health agency.  However, after CS began providing information to law enforcement, agents did not execute the search warrant on the home health agency. CS later retained an attorney and agreed to cooperate with the government. Although no promises have been made to CS, the CS is cooperating with the FBI, HHS, and the U.S. Attorney's Office in the hope that his cooperation will be factored into any charging decisions and in the resolution of any criminal charges. To date,

6

CS has not been charged with any crimes by the U.S. Attorney's Office in the Northern District of Illinois.

19.     As part of the investigation, at the instruction of law enforcement, CS made cash payments to doctors in exchange for those doctors to refer patients to CS's home health agency. The CS has submitted claims to Medicare on behalf of these referred patients and received reimbursement from Medicare for those claims. To date, CS has been allowed to retain these Medicare payments. While cooperating with the government, CS billed Medicare over $773,000 for patient referrals engendered by kickback payments to physicians. Some of the information provided to law enforcement by CS was provided subject to a proffer letter agreement with the government.

20.     During proffer-protected interviews with law enforcement in April of 2014, CS identified physicians to whom the CS had previously paid kickbacks. Among the physicians identified was ODESSKY. CS indicated that s/he had made payments to ODESSKY on numerous occasions prior to being confronted by law enforcement in March 2014. More detailed information on these prior kickback payments is discussed below.

21.     At the direction of law enforcement, CS arranged for the payment of money to ODESSKY in exchange for his continued referral of patients to CS's home health agency.

7

## ODESSKY KICKBACK PAYMENTS

22.    According to CS, CS has had an on and off relationship with ODESSKY from 2005 through the present, and paid him $7500 in December of 2013 for patient referrals.   According to Medicare records, CS's home health agency received almost $183,000 in Medicare reimbursements for home health services from March 10, 2014, through February 4, 2016, based on referrals from ODESSKY.

### April 26, 2014 - $5000 Kickback Payment

23.    On April 26, 2014, at the direction of law enforcement and after previously talking with ODESSKY on the telephone in a recorded call to arrange the meeting, the CS met ODESSKY at ODESSKY's clinic located on South Buffalo Grove Road in Buffalo Grove, Illinois. As explained below, the CS paid ODESSKY $5,000 in exchange for patient referrals at this meeting.

24.    Law enforcement met the CS prior to the meeting with ODESSKY on April 26, 2014.  At that time, agents provided the CS with a covert recording device, and $5,000 for the transaction with ODESSKY.   In addition, law enforcement searched the CS's person and vehicle before and after the meeting with ODESSKY. During the search of ODESSKY, agents found $2,000 in the CS's wallet, and $16 in the CS's clothing, all of which he was allowed to maintain. No additional money or contraband was found.

25.    CS then met with ODESSKY in his clinic.  According to CS and the recording, during this meeting, the CS handed ODESSKY an envelope, which

contained $5,000. ODESSKY and the CS stated, among other things, the following in the Russian language:

| | |
|---|---|
| CS: | Well, how are things? |
| ODESSKY: | Well, how are things? Same as with everyone. |
| CS: | What do you mean by "same as with everyone"? You give a small number of patients. Doctor! |
| ODESSKY: | [*unintelligible*] the patients. |
| CS: | Where do you give them to? |
| ODESSKY: | Lesser number of patients. |
| CS: | Tell the truth. |
| ODESSKY: | The patient is now only at the expense of Public Aid. |
| CS: | And where do you give the main ones now? |
| ODESSKY: | [*overlapping voices*] [*unintelligible*] |
| CS: | You are a hustler, Doctor. |
| ODESSKY: | No. |
| CS: | [Name redacted], I counted 17 patients. |
| ODESSKY: | What, what? |
| CS: | I counted 17 patients by 300, fifty-one hundred. |
| ODESSKY: | For what period of time is it? |
| CS: | Well, for now. |
| ODESSKY: | [*unintelligible*] year? |
| CS: | Well, the last time we saw each other was in July. |
| ODESSKY: | Oh , all right [*whispers, unintelligible*] |
| CS: | Give us people. |
| ODESSKY: | [*whispers, unintelligible*] [Company name redacted]. Who do you take? |
| CS: | Well, we have only old patients. We have nobody new. |
| ODESSKY: | Eyeless, blind? [*unintelligible*] |
| CS: | No, we do not take Medicaid. |
| ODESSKY: | What do you take? Only Medicare? |
| CS: | Ah-huh. |
| ODESSKY: | All [name redacted] now goes for whatever you want [laughs]. Public aid [*unintelligible*] will choke. |
| CS: | Give the lesser number to other places. Give more to me because somebody has warmed your palm. |

\*          \*          \*

*[Further along in the conversation]*

9

| CS: | Have in mind that everything remains in force: 300 for a person [Medicare beneficiary] as we talked. Only give me more of them. |
| ODESSKY: | Okay. |
| CS: | That's all. I was glad to see you. |
| ODESSKY: | Thank you. |

26.     According to the CS, the $5000 payment was for 17 home health certifications or re-certifications. According to the CS, he actually owed ODESSKY $5100, which was $300 for each of the 17 patients. Law enforcement only provided the CS $5000.

### May 23, 2015 - $6,600 Kickback Payment

27.     On May 23, 2015, at the direction of law enforcement and after previously talking with ODESSKY on the telephone to arrange the meeting, the CS met ODESSKY at ODESSKY's clinic located on South Buffalo Grove Road in Buffalo Grove, Illinois. As explained below, the CS paid ODESSKY $6,600 in exchange for patient referrals during this May 23 meeting.

28.     Law enforcement met the CS prior to the May 23 meeting with ODESSKY. At that time, agents provided the CS with a covert recording device, and $6,600 for the transaction. In addition, law enforcement searched the CS's person and vehicle before and after the meeting with ODESSKY. They noted $702 in cash on the CS's person; the CS's vehicle contained a small amount of loose cash. CS was allowed to retain this money. No additional money or contraband was found.

29.     According to the CS and the recordings, during this meeting, the CS provided ODESSKY the $6,600. ODESSKY and the CS stated, among other things, the following in the Russian language:

CS:            Here is what happened. Six, six hundred, uh, there were 22 cases. Now there's a question for you.

ODESSKY:   Which is?

CS:            For a year, I haven't received a single new patient. I don't know, in your agreements, with mine...

ODESSKY:   [*unintelligible*]

CS:            I offer you a new deal, but I want new patients, under this.

*[inaudible conversation with third party]*

CS:            I offer six hundred per person, and we square up every three months. Once per quarter. And give me new patients, and you, all, you always give them to others.

\*              \*              \*

*[Further along in the conversation]*

CS:            Well give me new patients. New *deal* – 600 for a person. We'll see each other towards September.

ODESSKY:   Good.

According to the CS, the $6600 payment was for 22 home health certifications or re-certifications at $300 per certification.

11

**February 13, 2016 - $3000 Kickback Payment**

30.     On or about February 13, 2016, at the direction of law enforcement and after previously talking with ODESSKY on the telephone to arrange the meeting, the CS met ODESSKY at ODESSKY's clinic located on South Buffalo Grove Road in Buffalo Grove, Illinois. At this meeting, the CS paid ODESSKY $3,000 in exchange for patient referrals..

31.     Law enforcement met the CS prior to the February 13 meeting with ODESSKY. At that time, agents provided the CS with a covert recording device, and $3,000 for the transaction. In addition, law enforcement searched the CS's person and vehicle before and after the meeting with ODESSKY. They did not note anything significant during the searches before or after the meeting.

32.     According to the CS and the recording, during this meeting, the CS handed ODESSKY an envelope which contained $3,000. ODESSKY immediately placed this envelope in his pants pocket without looking at it. ODESSKY and the CS state, among other things, the following in the Russian language:

| | |
|---|---|
| CS: | Not much, what is going on with you? There is $3,000. I had three people new and two recerts. |
| ODESSKY: | Do you know, that I am... Well, recerts there was more, but it's not important. The thing is...You said that you will be stopping by [*overlapping voices*] |
| CS: | I gave you $600 each?! |
| ODESSKY: | Shhh...Quiet, quiet, quiet. [*unintelligible*] You said, I will be stopping by and then disappeared again almost for a year. Do you understand, once you already sold your company. [referring to a time several years earlier when the CS had closed another business] |

\*        \*        \*

*[Further along in the conversation]*

CS:          Well...*[overlapping voices]* I received from you only 3 *brand new patients*. That's all.

ODESSKY:  Because I remember that I...*[overlapping voices]*

CS:          And two *[unintelligible]* *[overlapping voices]*

ODESSKY:  ...in June, in June...somehow...there were no people. I thought, maybe I need to get some people to Yury. Then in July they appeared *[overlapping voices]*

CS:          You had a couple, - husband and wife and you gave them to us.

ODESSKY:  I gave you three back in July. *[overlapping voices]*

CS:          Yes. *[overlapping voices]*

ODESSKY:  Then... *[unintelligible]* *[overlapping voices]*

CS:          And that was it *[overlapping voices]*

ODESSKY:  There was nothing August *[unintelligible]* *[overlapping voices]*

CS:          And you returned *[overlapping voices]* to your former friends.

ODESSKY:  And then...*[overlapping voices]*

CS:          What about September, October, November, December and January?

ODESSKY:  I figured you disappeared again, went underwater *[overlapping voices]*

CS:          I always come back, don't I?

ODESSKY:  You...you said that you will be stopping by.

CS:          I said that, meanwhile...Yes, that is true, I said it *[overlapping voices]*

ODESSKY:  And had disappeared for eight months. So I thought, something is not right again. He is planning on changing his business or something.

33.    According to the CS, the $3000 payment was for six home health certifications or re-certifications.

## INTERVIEW OF ODESSKY

34.    On February 25, 2016, law enforcement interviewed ODESSKY. During this interview, ODESSKY stated that he knew that accepting money for patient referrals was illegal. He stated that he attended a conference or a training seminar wherein he learned about kickbacks being illegal. This conference occurred several years ago. Additionally, when asked by law enforcement, ODESSKY said that he has not accepted kickbacks for patient referrals.

## CONCLUSION

35.     Based on the foregoing, I believe there is probable cause to believe that on or about February 13, 2016, at Buffalo Grove, in the Northern District of Illinois, Eastern Division, ODESSKY knowingly and willfully solicited and received, directly and indirectly, overtly and covertly, remuneration in the amount of $3,000 from CS, in return for referring patients to CS's home health agency for the furnishing of services for which payments may be made in whole and in part under a Federal health care program, namely Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

Peter Theiler
Special Agent, U.S. Department of
Health and Human Services

Subscribed and sworn
before me this 17th day of June, 2016

Honorable Sidney I. Schenkier
United States Magistrate Judge

15